## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHELLE RUGGERI, individually, | ) ) ) ) ) | 2:19-CV-862-NR |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| MAGEE-WOMENS RESEARCH INSTITUTE AND FOUNDATION; UNIVERSITY OF PITTSBURGH; UNIVERSITY OF PITTSBURGH MEDICAL CENTER; and UPMC MAGEE-WOMENS HOSPITAL, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Relator Michelle Ruggeri brings this *qui tam* action against Defendants Magee-Womens Research Institute and Foundation (the "Foundation"), the University of Pittsburgh (the "University"), UPMC, and UPMC Magee-Womens Hospital (the "Hospital"), alleging substantive violations of and retaliation under the False Claims Act. Each Defendant has moved to dismiss the Second Amended Complaint. For the following reasons, the Court will grant the motion of UPMC and the Hospital (ECF 118) in its entirety; grant the motion of the University (ECF 112) in part; and deny the motion of the Foundation, with some narrowing of the theories of liability that may proceed (ECF 115).

## BACKGROUND

### I.    The Foundation receives grant funding from the National Institutes of Health.

Accepting as true the well-pled allegations in the Second Amended Complaint, the Foundation is a nonprofit corporation and research institute focused on women's

health research and education.   ECF 90, ¶ 53.   Though the Foundation is an independent entity with its own board of directors, it doesn't have its own employees. *Id.* ¶¶ 54-55.   Instead, UPMC and Magee-Womens Hospital essentially "lease" employees to the Foundation and provide office and research space and administrative services, including payroll, HR, email, and research support. *Id.* ¶¶ 26, 55-56.  The Foundation, in turn, reimburses UPMC and the Hospital for providing the employees, space, and services.   ECF 90-2, p. 77; ECF 90-3, p. 86.

At the time of the relevant conduct here, the Foundation received 73% of its funding from grants awarded by the National Institutes of Health.   ECF 90, ¶ 51. Recipients of NIH grants must abide by certain requirements outlined in the Uniform Grant Guidance (2 C.F.R. § 200 *et seq.*) and NIH's Grants Policy Statement.   ECF 90, ¶ 89.   As relevant here, NIH grant recipients: (1) must have adequate financial management and internal controls systems, as stated in 2 C.F.R. § 200.302 and 45 C.F.R. § 75.302 (ECF 90, ¶¶ 93-96); (2) must not mismanage funds by improperly transferring costs to federal grants (*id.* ¶¶ 99-105); and (3) must report income generated by a grant-supported activity (*id.* ¶¶ 107-109).

A grant recipient makes representations and certifications to NIH over the lifecycle of a grant, including that the recipient will comply with NIH guidelines and that making false or misrepresentative statements to NIH can result in penalties. *Id.* ¶ 115.   As a prerequisite to receiving a disbursement, a recipient must provide NIH with financial and project performance reports and budgets, including a certification that the reports are true.   *Id.* ¶¶ 118-133.   NIH may adjust its disbursements depending on the representations in the progress reports. *Id.* ¶¶ 132-34.

## II.   Ms. Ruggeri's employment as the Foundation's Director of Grants and Contracts.

In September 2017, the Hospital hired Ms. Ruggeri as the Foundation's Director of Grants and Contracts to "revamp" the Foundation's internal accounting

and compliance systems. *Id.* ¶¶ 32, 288. Ms. Ruggeri discovered that the Foundation lacked internal accounting controls and engaged in improper accounting practices that potentially violated NIH's Grants Policy Statement. *Id.* ¶ 35. She undertook reform measures to bring the Foundation into compliance, including meeting with executives and directors of the Foundation, the University, and UPMC; halting improper accounting practices; and attempting to implement a new accounting system. *Id.* ¶ 288.

Ms. Ruggeri alleges that her superiors—including Dr. Yoel Sadovsky, the Executive Director of the Foundation and a board member (*id.* ¶ 63), Michael Annichine, the CEO of the Foundation and a board member (*id.* ¶ 64), and Sara Arvay, Senior Director of the Foundation (*id.* ¶ 67)—resisted her efforts. *Id.* ¶¶ 290-304. Frustrated with their stonewalling, on April 2, 2018, Ms. Ruggeri drafted an Assessment of Grant Compliance, shared it with her superiors, and then, going outside the chain of command, delivered it to Dr. Robert Edwards, a Department Chair at the University and a member of the Foundation's board. *Id.* ¶¶ 38, 306-14. In this assessment, Ms. Ruggeri "detailed specific failures and applicable regulations that created potential liability under the False Claims Act and included recommendations for addressing them." *Id.* ¶¶ 315-17. Hours after delivering her assessment to Dr. Edwards, Mr. Annichine terminated Ms. Ruggeri's employment. *Id.* ¶ 319.

### III. Ms. Ruggeri alleges three institutional deficiencies that she asserts amount to FCA violations.

Ms. Ruggeri points to three schemes and certifications that Defendants committed in violation of the FCA.

**First**, she alleges that the Foundation failed to maintain an adequate accounting and financial system. Under Grants Policy Statement § 8.3.1, grant recipients agree to maintain a financial management system that complies with the

standards and requirements set forth in 2 C.F.R. § 200.302 and 45 C.F.R. § 75.302. ECF 90, ¶¶ 93-96; *see also* Grants Policy Statement § 8.3.1.  But Ms. Ruggeri alleges that the Foundation's system was "outdated and obsolete," "cumbersome," and highly limited in its ability to produce reports, trace expenditures, and budget, such that the budgets and reports that the Foundation submitted to NIH "could not be accurate." *Id.* ¶¶ 98, 167-75.  Defendants violated the FCA by fraudulently inducing NIH to award grants and disburse funds by falsely certifying that the Foundation's system was compliant, and by making false certifications to NIH every time an inaccurate budget or report was submitted.  *Id.* ¶¶ 97-98.

**Second**, Ms. Ruggeri pleads that Defendants improperly spent federal grant money on unauthorized costs for unrelated projects in a "spenddown" scheme.  Under the Grants Policy Statement, a grant recipient generally may not transfer costs from non-federal grant accounts to federal grant accounts, unless the cost was incurred specifically for that federal award and benefitted the account receiving the federal award.  *Id.* ¶¶ 101-106; 2 C.F.R. § 200.405(a).  Ms. Ruggeri alleges that the Foundation routinely transferred costs—namely, employee salaries—from unrelated accounts with a budget deficit to federal award accounts with a budget surplus.  ECF 90, ¶¶ 186-247.  In other words, the Foundation, with the sign-off of employees of the University, charged costs to federal grant accounts for work performed on unrelated projects.  Thus, the Foundation and the University submitted factually false claims to NIH and falsely certified compliance.  *Id.* ¶ 106.

**Third**, Ms. Ruggeri alleges that the Foundation failed to report "program income"—that is, income that was directly generated by the grant-supported activity or earned through the grant—to NIH.  *Id.* ¶ 107.  Ms. Ruggeri alleges that the

Foundation received program income in the form of costs saved, but either underreported or failed to report those funds.  *Id.* ¶¶ 265-73.

## IV.   Procedural background.

In July 2019, Ms. Ruggeri brought this *qui tam* action on behalf of the United States against Defendants for substantive violations of the False Claims Act, and individually for retaliation.  ECF 2 (Complaint); ECF 14 (First Amended Complaint). The government spent more than three years purportedly investigating Ms. Ruggeri's allegations before ultimately declining to intervene in the matter.  ECF 56.  Ms. Ruggeri decided to go it alone (ECF 60) and filed a Second Amended Complaint ("SAC") (ECF 90).

Each Defendant individually moved to dismiss the SAC, but incorporated the other Defendants' motions and briefs by reference.  ECF 112; ECF 115; ECF 118.  The Foundation focused on Ms. Ruggeri's failure to state a claim for a substantive FCA violation (ECF 116), while the University (ECF 113) and UPMC and the Hospital (ECF 119) focused on FCA retaliation.  The Court held oral argument on the motions on February 28, 2024.  ECF 134.  The motions are now ready for disposition.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must make "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (cleaned up).  "Thus, to survive a motion to dismiss, a complaint must state a claim to relief that is plausible on its face by providing facts which permit the court to infer more than the mere possibility of misconduct."  *United States ex rel. Menoher v. FPoliSolutions, LLC*, No. 19-855, 2021 WL 3513860, at *3 (W.D. Pa. Aug. 10, 2021) (Kelly, M.J.) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

A plaintiff alleging substantive violations of the FCA must meet the heightened pleading standard in Rule 9(b). *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 n.6. (2016). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity, the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

To satisfy Rule 9(b) in the context of an FCA violation, the relator must "allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (cleaned up). A relator need not show "representative samples of the alleged fraudulent conduct" at the pleading stage. *Id.* at 156-57 (cleaned up). But "an inference of illegality based on facts that could plausibly have either a legal or illegal explanation would be insufficient to meet Rule 9(b)'s burden, because a relator must establish a strong inference that false claims were submitted[,] and the possibility of a legitimate explanation undermines the strength of the inference of illegality." *United States v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018) (cleaned up).

By contrast, a claim for FCA retaliation is not subject to Rule 9(b)'s heightened standard because "the retaliation provisions do not require the plaintiff to have developed a winning qui tam action; they only require that the plaintiff engage in acts made in furtherance of an FCA action." *United States ex rel. Perri v. Novartis Pharms. Corp.*, No. 15-6547, 2019 WL 6880006, at *19 (D.N.J. Feb. 21, 2019) (cleaned up). Thus, the pleading standard of Rule 8 governs FCA retaliation claims.

<u>**DISCUSSION & ANALYSIS**</u>

The FCA "imposes civil liability for making a false or fraudulent 'claim,' or a false record or statement material to such a claim, to obtain payment from the federal government." *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 324 (3d Cir. 2021) (citing 31 U.S.C. § 3729(a)(1)(A)-(G), (b)(2)). As relevant here, the FCA makes it unlawful for a defendant to:

- Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

- Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

- Conspire to commit a violation;

- Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal or decrease an obligation to pay or transmit money.

31 U.S.C. § 3729(a)(1)(A)-(C), (G). Ms. Ruggeri alleges that the three institutional deficiencies—inadequate accounting system, spenddown scheme, and failure to report program income—violated these four FCA provisions.

## I. The Court will dismiss UPMC and Magee-Womens Hospital.

At the outset, the Court will grant UPMC and the Hospital's motion. The only basis of liability for these Defendants—respondeat superior—fails. ECF 90, ¶¶ 341, 348. Though UPMC and the Hospital technically employed the key players in this case, including Dr. Sadovsky, Mr. Annichine, Ms. Arvay, and Ms. Ruggeri herself, the SAC only pleads that these employees acted for the benefit of the Foundation, not UPMC and the Hospital. ECF 90, ¶¶ 52, 56, 63-69.

"[T]he Third Circuit, following Supreme Court guidance, employs traditional common law theories of the employment relationship when considering the proper

parties in FCA retaliation claims." *Trezza v. Soans Christian Acad., Inc.*, No. 18-1626, 2019 WL 1359740, at *4 (E.D. Pa. Mar. 25, 2019). So to impute the actions and knowledge of the employees to UPMC and the Hospital, Ms. Ruggeri must establish that each employee was acting "(1) in the course of his employment and (2) for the benefit of the corporation." *United States v. DiBona*, 614 F. Supp. 40, 44 (E.D. Pa. 1984); *Klein v. Com. Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017) (Conti, J.) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." (cleaned up)).

But each allegation of wrongdoing shows that at all relevant times the employees were acting for the benefit of the Foundation, so they never acted on behalf of UPMC or the Hospital. *E.g.*, ECF 90, ¶¶ 63-69 (explaining various roles and duties at the Foundation), 156 (alleging Dr. Sadovsky, Mr. Annichine, and Ms. Arvay directed activities at the Foundation), 174 (explaining deficiencies in the Foundation's accounting system), 176 (detailing Mr. Annichine's refusal to implement new accounting software as CEO of the Foundation), 232 (alleging conversations between University PIs and "Magee Foundation's Grants team" to carry out improper cost transfers). The SAC specifically pleads that the Foundation "remains legally responsible for the actions of its staff[,]" further supporting that the employees were acting for the Foundation, not the other Defendants. *Id.* ¶ 332.

The Foundation's IRS Form 990s, which the SAC incorporates, confirm that the relevant individuals, while employed (*i.e.*, paid) by UPMC, were essentially loaned out to the Foundation. As such, they acted "in support of the mission" of the Foundation, and the Foundation was financially responsible for these employees' salaries based on the work that they performed for the Foundation:

> All individuals who work in support of the mission of [the Foundation] are employed either by the University of Pittsburgh or [UPMC]. [The

> Foundation] is billed by each organization for the cost of salary and fringe benefits corresponding to the effort these individuals expend in support of the [Foundation's] mission. [The Foundation] records such costs as compensation on its financial statements. Payroll taxes are filed by the employer organizations.

ECF 90-2, p. 77; ECF 90-3, p. 86. The Forms also provide that the Foundation reimbursed the University and UPMC for 100% of the salaries of both Dr. Sadovsky (as Executive Director) and Mr. Annichine (as CEO). ECF 90-2, p. 82; ECF 90-3, p. 79. Dr. Sadovsky split his time evenly between medical research and fulfilling "his Executive Director responsibilities[,]" and Mr. Annichine spent "100%" of his time "supporting the mission of [the Foundation][.]" *Id.* These descriptions reflect the picture created by the SAC—that the employees worked for the benefit of the Foundation.

To establish liability under the FCA, Ms. Ruggeri must allege that UPMC and the Hospital "had [a] role" in the false claims scheme, not a mere association with the Foundation. *U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 523-24 (E.D. Pa. 2010) (emails showing employees of parent company "were involved in determining what technical documentation to supply to the government" could not support theory that parent company "had any role" in false claims scheme). Since the SAC fails to allege with specificity any action taken for the benefit of UPMC and the Hospital, the employees' actions and knowledge cannot be imputed to those employers. Thus, there is no basis to hold UPMC and the Hospital liable. The Court will grant their motion to dismiss.

## II. Substantive violations of the False Claims Act.

"A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017). Defendants argue that the SAC fails to establish falsity

under the pleading standard of Rule 9(b) and materiality as outlined by the Supreme Court in *Escobar*.

### A.   Allegations about the Foundation's inadequate accounting system.

Ms. Ruggeri alleges that the Foundation fraudulently induced NIH to award grants and disburse funds by falsely certifying that the Foundation's accounting systems complied with the Grants Policy Statement and federal regulations.  She therefore sets forth two theories of FCA liability: fraudulent inducement, and false certification (both express and implied).[1]  Ms. Ruggeri has sufficiently pled particular details about the Foundation's financial system to survive the motion-to-dismiss stage under both theories of liability.

As alleged in the SAC, the Foundation committed itself to complying with the Grants Policy Statement and incorporated federal laws and regulations, including 45 C.F.R. § 75.302, when it accepted NIH funds.  ECF 90, ¶ 93.  Those provisions state that an award recipient's financial system must be "sufficient to permit the preparation of reports required by general and program-specific terms and conditions; and the tracing of funds to a level of expenditures adequate to establish

---

[1] "To prevail on a fraudulent inducement claim under the False Claims Act, a plaintiff must show that (1) there was a knowingly false or fraudulent statement; (2) that the statement was material; and (3) that it caused the government to pay out money or to forfeit moneys due (*i.e.*, a 'claim')."  *Thomas*, 593 F. App'x at 143.  "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds."  *U.S. ex rel. Richards v. R & T Invs. LLC*, 29 F. Supp. 3d 553, 561 (W.D. Pa. 2014) (Hornak, C.J.) (cleaned up).  Under an implied false certification theory, liability "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment."  *Id.* at 562 (cleaned up).

that such funds have been used according to the Federal statutes, regulations, and the terms and condition of the federal award." *Id.*

But the Foundation's financial system couldn't do that—it couldn't trace budget expenditures, couldn't produce accurate monthly reports, and couldn't be used to verify that account funds were being properly spent. *Id.* ¶¶ 93, 161-76. Ms. Ruggeri alleges that, by signing and presenting grant applications and post-award reports to NIH to receive disbursements, despite knowing that its accounting system was non-compliant, the Foundation both induced NIH to disburse funds that it otherwise wouldn't have and made false certifications of compliance. *Id.* ¶¶ 116-34. Those details provide "reliable indicia that lead to a strong inference" that the Foundation submitted false claims to NIH. *Foglia*, 754 F.3d at 156 (cleaned up).

The Foundation argues that the SAC fails to allege that its accounting system or budgets violated any federal regulations. ECF 116, pp. 6-7. But the SAC pleads that a grant recipient's "failure to establish adequate control systems constitutes a material violation of the award." ECF 90, ¶ 95.

The well-pled facts explain that the Foundation repeatedly certified in its grant applications and reports that its system was sufficient (*id.* ¶¶ 113-31) even though its system was anything but (*id.* ¶¶ 161-76). That's enough to plead falsity under the relevant pleading standard. *Siebert v. Gene Sec. Network, Inc.*, No. 11-1987, 2013 WL 3052882, at *5 (N.D. Cal. June 17, 2013) (denying motion to dismiss where "Plaintiff alleges that each application for an NIH grant requires that the applicant affirm its compliance with various financial management system requirements and

that in response to the Financial Questionnaire, [Defendant] expressly affirmed the existence of financial systems it did not have in place" (cleaned up)).[2]

**B.    Allegations about the spenddown scheme.**

Next, Ms. Ruggeri alleges that Defendants are liable for making factually false claims to NIH via the Foundation's "spenddown" scheme by improperly transferring costs to federal grant accounts.   A claim is factually false "when the claimant misrepresents what goods or services that it provided to the Government." *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 500 F. Supp. 3d 345, 358 (E.D. Pa. 2020) (cleaned up).

The SAC adequately alleges that the Foundation misrepresented how it spent federal dollars by detailing the Foundation's practice of overspending on accounts and transferring those excessive costs (often employee "effort," *i.e.*, salary) to federal accounts that did not accrue them.   ECF 90, ¶¶ 189, 201, 204, 217-64.   That process violated both Grants Policy Statement § 7.5, which states that cost transfers to federal awards "solely to cover cost overruns are not allowable," and federal regulations requiring that any salaries paid by federal awards "be based on records that accurately reflect the work performed." *Id.* ¶¶ 103-05, 218, 224; ECF 124, p. 16 (citing 45 C.F.R. § 75.430(h)(i)(1)).   It also means that the Foundation billed the federal accounts for "effort" that was not actually performed for those accounts.   That is a "factually false" claim.

The Foundation argues that Ms. Ruggeri hasn't pointed to any specific cost transfers that were improper under the policy statement or federal regulations (*i.e.*,

---

[2] The Foundation also argues that the Grants Policy Statement allows it to re-budget and provides it with budget flexibility, depending on several factors.   ECF 116, p. 7. The allegations in the SAC concerning the accounting system, though, clearly plead that the discrepancies with the budgets were a product of inadequate controls, not allowable re-budgeting considerations.   ECF 90, ¶¶ 91-98, 161-75.   Discovery may bear out a different story, but the Court is constrained to accept as true the allegations in the SAC at this stage.

from non-federal accounts to unrelated federal accounts).  ECF 116, pp. 8-12; ECF 136, 12:1-15:7.  Not so.

Ms. Ruggeri describes a federal account ledger evidencing thousands of dollars in improper cost transfers.  ECF 90, ¶¶ 250-64; ECF 136, 44:1-45:8 (describing transfer of employee salary into federal grant account where employee purportedly did not work on that federal account).  She also alleges that NIH audited the Foundation and found repeat cost-transfer violations, resulting in NIH forbidding the Foundation from transferring costs to federal accounts without prior approval.  ECF 90, ¶¶ 43-44.  Those specific, well-pled allegations, coupled with the allegation that NIH grants made up about 73% of the Foundation's funding, create reliable indicia that these spenddown cost transfers from non-federal accounts to federal accounts were widespread and improper.  This claim survives against the Foundation.

This theory of liability may also proceed against the University.  According to the SAC, University employees, known as Principal Investigators (or "PIs"), contributed to the spenddown scheme by misrepresenting employee "effort" spent on federal accounts.  *Id.* ¶¶ 27, 355.  These PIs were responsible for signing and submitting Personnel Activity Reports ("PARs"), which reflect the work performed by each employee on a given NIH grant account.  *Id.* ¶ 105.  The SAC alleges with specificity that PIs routinely modified the amount of "effort" employees worked on the federal accounts to accommodate the cost transfers.  *Id.* ¶¶ 106, 186-264.  The PIs then submitted the PARs to an internal University system and were approved by the University, resulting in overpayment on the federal accounts.  *Id.* ¶¶ 27, 106, 240-46.  Thus, as alleged, the University misrepresented the services it provided on the federal grant accounts.

### C.   Allegations about failure to report program income.

Unlike the first two institutional deficiencies, Ms. Ruggeri's claim about the Foundation's failure to report program income does not survive the pleading

standard.  She alleges that Defendants failed to book program income as accounts receivable to avoid restrictions on, and the potential return of, unspent grant funds. *Id.* ¶¶ 265-69.  She thus charges Defendants with making "reverse false claims," where a person or company wrongfully retains money it should have paid to the government.  *Id.* ¶ 273; *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 247 (3d Cir. 2016) (citing 31 U.S.C. § 3729(a)(1)(G)).

This theory of liability comes up short for at least three reasons.

First, saved costs are not the same as "program income," which is defined in Policy Statement § 8.3.2 as "gross income that was directly generated by the grant-supported activity or earned as a result of the award."  ECF 124, p. 15 (quoting Grants Policy Statement § 8.3.2) (cleaned up).  Ms. Ruggeri argues that this definition is "broad enough" to encompass costs saved, but the Policy Statement reflects that "program income" refers to funds generated by sales, charges, fees, and royalties through the federal account.  Grants Policy Statement § 8.3.2; ECF 90, ¶ 107; ECF 124, p. 15.

Second, even if costs saved do qualify as program income, the theory still fails because Ms. Ruggeri doesn't allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Foglia*, 754 F.3d at 156 (cleaned up).  She points to just one vague email in which a Foundation employee states that the Foundation isn't "doing the [accounts receivable] reclass [journal entry] for milestone based invoices," but that doesn't provide sufficient information under the pleading standard to show a knowingly false scheme to avoid reporting program income.  ECF 90, ¶¶ 271-72.

Third, as Ms. Ruggeri concedes, a grant recipient does not always have to return excess funds to NIH.  *Id.* ¶ 108.  But for a reverse false claim theory to apply, "there must be a clear obligation or liability to the Government, which cannot be premised on a future discretionary act."  *United States ex rel. Ellsworth Assoc., LLP*

*v. CVS Health Corp.*, 660 F. Supp. 3d 381, 407 (E.D. Pa. 2023).  Since Ms. Ruggeri can only allege that NIH "would likely have required [the Foundation] to return program income[,]" but not that a clear obligation to return that income existed, her reverse false claim theory fails.  ECF 90, ¶ 111.

### D. Materiality.

Defendants argue that even if Ms. Ruggeri states plausible theories of liability, she fails to plead materiality.  The Court disagrees.

An FCA violation is actionable only if the misrepresentation is "material to the Government's payment decision."  *Escobar*, 579 U.S. at 192.  "This requirement helps ensure that the False Claims Act does not become an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract."  *Petratos*, 855 F.3d at 489 (cleaned up).

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  This standard is "demanding."  *Escobar*, 579 U.S. at 194.  "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.  Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Id.*

That said, it is relevant for purposes of materiality if the government deems compliance as a condition of payment, if the defendant knew that the government

- 15 -

doesn't pay in similar cases of non-compliance, and if the government's behavior is influenced by any such violations. *Escobar*, 579 U.S. at 194-95.

Here, considering these factors that the Supreme Court has deemed to be relevant as to materiality, Ms. Ruggeri has met her burden at the motion-to-dismiss stage.

First, aspects of the scheme detailed in the SAC concern compliance requirements that NIH considered as conditions for receiving award disbursements— and thus such violations can "meet the FCA [materiality] standard." *Siebert*, 2013 WL 3052882, at *7; *Escobar*, 579 U.S. at 190-91. Indeed, the Grants Policy Statement says that failure to have adequate controls is a "material violation" of the award. ECF 90, ¶¶ 95, 275 (quoting Grants Policy Statement § 8.3.1).

Second, the SAC also pleads that the Foundation knew that in other similar cases of non-compliance, the government refused to pay or took adverse action. In fact, Ms. Ruggeri alleges that she was hired to "revamp" the Foundation's grant department "due to concerns regarding internal controls and regulatory compliance" following the initiation of a government investigation into the Foundation's practices. ECF 90, ¶¶ 32, 147. The SAC also pleads that the government has pursued actions against NIH grant recipients for similar schemes to the one alleged here. For example, and as pled in the SAC, the government intervened in a relator's FCA action against Columbia University where its financial reporting system did not have a suitable means for verifying the accuracy of reporting costs for time and effort, such that Columbia University overcharged grant accounts for work that was not actually performed.[3] *See Escobar*, 579 U.S. at 195 ("evidence that the defendant knows that

---

[3] ECF 90, ¶ 279 (citing Press Release, Department of Justice, Manhattan U.S. Attorney Settles Civil Fraud Claims Against Columbia University and Affiliated Public Health Program for Submitting False Claims in Connection with Aids and Hiv (sic) Treatment-Related Grants (Oct. 28, 2014), https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-settles-civil-fraud-claims-against-columbia-

the Government consistently refuses to pay claims in the mine run of cases based on noncompliance" may establish materiality).  If the Foundation and University didn't independently know about these other cases, the SAC alleges that Ms. Ruggeri, at least at one point in time, told them.  ECF 90, ¶¶ 38, 308-09, 332.

Third, perhaps the strongest evidence of materiality is the government's response after NIH learned of the Foundation's compliance issues, including the misallocation of costs.  As pled in the SAC, during the government's investigation into Ms. Ruggeri's allegations, NIH reviewed eight federal grants, which reflected 589 cost transfers between them all.  ECF 90, ¶ 284.  NIH randomly sampled ten of those transfers, and found each one violated NIH regulations and requirements.  *Id.*  As a result, "NIH forbade [the] Foundation from using cost transfers without prior written consent."  *Id.* ¶ 285.  Moreover, NIH substantially reduced its awards to the Foundation after Ms. Ruggeri's allegations surfaced, underscoring that these infractions were material.  *Id.* ¶ 286; *cf. Escobar*, 579 U.S. at 195 (it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated").

As the Foundation argues, the relevant inquiry is "what [] NIH did, or did not do, vis-à-vis the Foundation once it learned of" Ms. Ruggeri's allegations.  ECF 116, p. 18.  And as pled in the SAC, NIH altered how it awards, manages, and disburses grant funds to the Foundation in a material way, suggesting that the false representations here "go[] to the very essence of the bargain" between the Foundation

---

university-
and#:~:text=Columbia%20also%20agreed%20to%20pay,HIV%20projects%20around
%20the%20world); *see also id.* ¶ 278 (citing Press Release, Department of Justice,
Harvard University Agrees to Pay Over $1.3 Million to Resolve Allegations of
Overcharging NIH Grants (Apr. 27, 2020), https://www.justice.gov/usao-
ma/pr/harvard-university-agrees-pay-over-13-million-resolve-allegations-
overcharging-nih-grants).

and NIH, and affected NIH's payment decision. *Petratos*, 855 F.3d at 489 (cleaned up).  Thus, Ms. Ruggeri has satisfied the materiality prong at the pleading stage.

      **E.**    **Conspiracy.**

A conspiracy to violate the FCA is a violation of the FCA itself.  31 U.S.C. § 3729(a)(1)(C).  To state a claim for FCA conspiracy, a relator "must describe the general composition of the conspiracy, its broad objectives, and the general roles in the conspiracy." *Ellsworth Assoc., LLP*, 660 F. Supp. 3d at 405-06.  Specifically, Ms. Ruggeri "must allege (1) a conspiracy to get a false or fraudulent claim allowed or paid; and (2) an act in furtherance of the conspiracy." *Id.* at 406 (cleaned up).

The SAC establishes that a conspiracy to violate the FCA existed between the Foundation and the University.  As detailed above, University PIs and Foundation employees manipulated employee "effort" on federal grant accounts to accommodate improper cost transfers.  In her allegations, Ms. Ruggeri quotes several emails between and among Foundation employees and PIs establishing that the Foundation routinely initiated cost transfers to cover deficits in other accounts.  ECF 90, ¶¶ 227-246.  Based on these interactions, "[t]he Court can infer the existence of an agreement" between the University and the Foundation. *United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 541 (E.D. Pa. 2022) (cleaned up).  And based on the exhaustive details of account ledgers showing the transfers, including the results of the NIH audit that allegedly revealed a consistent improper practice, the SAC likewise establishes the steps taken in furtherance of the conspiracy.  ECF 90, ¶¶ 42-43, 248-264; *see Ellsworth Assoc., LLP*, 660 F. Supp. 3d at 406.  The conspiracy claim therefore survives as to the Foundation and the University.

**III.**    **Retaliation under the False Claims Act.**

In her second cause of action, Ms. Ruggeri alleges that Defendants terminated her employment in retaliation for her efforts to stop the purported FCA violations.  To state such a claim, she must plead that (1) she engaged in protected conduct and

(2) she was discriminated against because of her protected conduct. *United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 194 (3d Cir. 2022).[4] The Court concludes that Ms. Ruggeri has met her burden as to the Foundation, but not the University.

### A. Ms. Ruggeri engaged in protected activity when she delivered her report to a non-officer board member.

The FCA "protect[s] lawful acts in furtherance of either an action under the FCA or other efforts to stop 1 or more violations of the Act." *Ascolese*, 55 F.4th at 195 (cleaned up). Protected activity "includes investigation for, initiating of, testimony for, or assistance in a False Claims Act suit, which can include internal reporting and investigation of an employer's false or fraudulent claims." *United States ex rel. Rose v. Select Rehab., LLC*, 668 F. Supp. 3d 368, 373 (E.D. Pa. Apr. 6, 2023) (cleaned up).

But it isn't enough for the employee to investigate mere non-compliance—she must specifically investigate FCA fraud. *Id.* ("An employee's investigation of nothing more than his employer's non-compliance with federal or state regulations does not constitute protected conduct." (cleaned up)). Additionally, if a relator's job entailed duties related to compliance, like Ms. Ruggeri's, her acts must have exceeded her job responsibilities to receive FCA protection, such as by "act[ing] outside of [her] chain of command or [her] job duties." *Ascolese*, 55 F.4th at 195. This inquiry is "fact intensive." *Id.*

Ms. Ruggeri engaged in protected activity on April 2, 2018, when she prepared her Assessment of Grant Compliance, shared it with her superiors, and then hand-

---

[4] She must also show that the underlying FCA claim that she was addressing was at least "viable." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 508 (3d Cir. 2017); *id.* at 508 n.56. Because the Court has already concluded that the SAC adequately alleges FCA violations by the Foundation and the University, Ms. Ruggeri has satisfied this prong.

delivered it to Dr. Edwards, who was a Foundation board member.  ECF 90, ¶¶ 314-18.  In taking this action, importantly, Ms. Ruggeri stepped outside the chain of command: she went past her supervisors, taking her report directly to a board member, Dr. Edwards.  *Id.* ¶¶ 305-314; *cf. Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 20 (D.D.C. 2015) (plaintiff in finance division went outside chain of command when he reported concerns of FCA violations to COO and head of another department); *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239-40 (D.C. Cir. 2012) (employee stepped outside chain of command when she raised FCA allegations with her boss's supervisor).[5]  By sharing a report with Dr. Edwards directly, Ms. Ruggeri engaged in activity beyond her normal compliance duties.

Further, the report went beyond describing mere non-compliance and specifically outlined FCA liability.  For example, the report detailed that two universities were fined for failing to comply with NIH guidelines in the same manner as the Foundation.  ECF 90-1, p. 2.  It also warned, "It should be clearly understood that the federal government has no interest in [the Foundation's] best interests.  [The government's] sole focus is the appropriate use of federal monies according to the statute."  *Id.* at 6-7; *see also* ECF 90, ¶¶ 315-16.[6]  Given this content, the report from

---

[5] Ms. Ruggeri described Dr. Edwards as "effectively next up in the chain of command[.]"  ECF 90, ¶ 39.  But because making reports to board members directly was "outside of [Ms. Ruggeri's] ordinary reporting structure[,]" the Court views this action as stepping outside the chain of command.  *Crosbie v. Highmark, Inc.*, No. 19-1235, 2019 WL 6530990, at *6 (E.D. Pa. Dec. 4, 2019).

[6] To be clear, the other asserted reporting activities outlined in the SAC do not constitute protected activity.  First, they addressed compliance issues, not fraud.  *E.g.*, ECF 90, ¶¶ 157 (Ms. Ruggeri was hired "to bring Magee Foundation into compliance with federal regulations."), 288 (describing specific efforts to achieve compliance).  Second, as alleged, Ms. Ruggeri's efforts mirrored, rather than exceeded, the scope of her job duties.  ECF 90-6, pp. 8-9 (describing Ms. Ruggeri's job responsibilities).

Ms. Ruggeri to Dr. Edwards constitutes protected activity for purposes of bringing a FCA retaliation claim.

> **B.     The Foundation was on notice of Ms. Ruggeri's protected activity and retaliated against her because of it.**

To show that she was discriminated against "because of" protected conduct, Ms. Ruggeri must allege that "(1) [her] employer had knowledge [she] was engaged in protected conduct; and (2) that [her] employer's retaliation was motivated, at least in part, by the employee's engaging in protected conduct." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (cleaned up).  She must plead facts "that plausibly showed [Defendant] was on notice [she] tried to stop [Defendant's] alleged FCA violations." *Ascolese*, 55 F.4th at 195.

Ms. Ruggeri has done so with respect to the actions she took on April 2, 2018. In an April 2, 2018, email to Ms. Arvay, Dr. Sadovsky, and Mr. Annichine, Ms. Ruggeri put her superiors on notice that the Foundation's issues were not merely compliance-based, but fraudulent.  The email highlighted the difference between "grant compliance" and the "need[] to pass the scrutiny" of a federal audit, and warned that "the government is . . . only concerned with the correct spending of the federal dollars and that this spending meets statutory requirements."  ECF 90, ¶ 309. In the same email, she attached her assessment, in which she stressed that institutions have been "fined" for similar issues.  ECF 90, ¶¶ 37-38; ECF 90-1, p. 2. That establishes knowledge.

The Foundation terminated Ms. Ruggeri's employment hours after she reported to Dr. Edwards.  ECF 90, ¶ 319.  The temporal proximity of these events— Ms. Ruggeri's putting her superiors on notice about potential FCA liability, escalating her concerns beyond the chain of command to Dr. Edwards, and the termination of her employment, all on the same day—suggests that the termination of her employment was motivated by her protected activity.  *United States ex rel. Scheer v.*

*Beebe Healthcare*, No. 20-6117, 2024 WL 219395, at *13 (E.D. Pa. Jan. 18, 2024) ("A plaintiff may establish a causal connection through the unusually suggestive temporal proximity of the adverse action to the protected activity[.]" (cleaned up)).

It also doesn't matter that the Foundation didn't directly employ Ms. Ruggeri. The text of the FCA protects individuals from retaliation "***because of*** lawful acts done by the employee[.]"  31 U.S.C. § 3730 (emphasis added).  In interpreting the phrase "because of" in this context, the Third Circuit held that "retaliation claims under the FCA require proof of 'but-for' causation."  *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018).  Thus, it's enough for the SAC to show that the Foundation was responsible for the retaliatory action even if it didn't pay Ms. Ruggeri's salary.  *See Ascolese*, 55 F.4th at 197 (cause of action for retaliation existed where defendant contractor instructed its subcontractor to terminate plaintiff's employment following FCA allegations).

The foregoing is enough to plead FCA retaliation as to the Foundation, but not against the other Defendants.  There are no allegations that UPMC, the Hospital, or the University had knowledge of the protected activity or engaged in the retaliatory conduct, including in making the decision to terminate Ms. Ruggeri.  ECF 90, ¶¶ 63-69, 71 (alleging Dr. Edwards's involvement with the Foundation was limited to his role "[a]s a member of the Magee Foundation board"), 322 (alleging that the Foundation "remains legally responsible for the actions of its staff"), 365-66 (pleading that University's involvement in retaliatory conduct against Ms. Ruggeri was limited to Dr. Edwards's "direct[ing] Relator's termination" after receiving her report); *see also* Section I, above.  The multiple hats that different individuals wore at other times isn't enough to impute knowledge of Ms. Ruggeri's report to UPMC, the Hospital, and the University.  *See Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 106-07 (3d Cir. 2009) ("[N]ot all facts known by an agent are imputed to the principal[,]" rather the agent's knowledge is imputed to the principal where the

knowledge falls within the scope of the agent's duties to the principal and if that knowledge is "important to the function the employee is employed to perform.").

For these reasons, the retaliation claim, while viable against the Foundation, must be dismissed as to the other Defendants.[7]

## CONCLUSION

In sum, the Court finds that Ms. Ruggeri has stated a claim for substantive FCA violations against the Foundation and the University, and a claim for FCA retaliation against the Foundation. Thus, for the reasons above, the Court will grant UPMC and the Hospital's motion to dismiss (ECF 118) and will grant the University's motion to dismiss (ECF 112) as to Count 2 only. The Court will deny the Foundation's motion (ECF 115), but as noted above, any FCA claims predicated on the "program income" fraud may not proceed and are effectively dismissed.

Additionally, as Ms. Ruggeri has amended her complaint twice since commencing this action almost five years ago, the Court finds that amendment would be inequitable. *Claude Worthington Benedum Found. v. Bank of New York Mellon, Corp.*, No. 19-132, 2020 WL 3316780, at *13 (W.D. Pa. June 18, 2020) (Ranjan, J.) (inequity would result by giving plaintiff a "third bite of the apple" (citation omitted)), *aff'd*, 849 F. App'x 36 (3d Cir. 2021). It would also be futile because the SAC establishes that the individual employees were at all relevant times working for the benefit of the Foundation (or, in the case of the PIs in Count 1, the University). Amendment cannot transform the nature of that work to extend liability to the other Defendants on the dismissed claims. *Id.* (inability to "cure" deficiency "through

---

[7] To the extent Ms. Ruggeri argues that UPMC and the Hospital are liable for retaliation because the UPMC Director of Human Resources joined Mr. Annichine in the room to terminate her employment (ECF 90, ¶¶ 40, 340), that argument fails because the SAC doesn't allege that the Director of Human Resources had any knowledge about Ms. Ruggeri's protected activity and any involvement in making the decision to terminate her employment.

additional factual development" made amendment futile).  So these dismissals are with prejudice.  An appropriate order follows.

DATED: April 24, 2024                           BY THE COURT:

                                                _/s/ J. Nicholas Ranjan_____
                                                United States District Judge